### TUNIS HUMMER

*v.*

### THOMAS BUERK et al.

[Decided February 6th, 1919.]

1. Sixty years unbroken adverse possession sets at complete rest a title to lands.

2. Where parties entered into an enforceable contract for sale of lands, the time for performance of which was twice extended because of a mutual mistake as to the marketable character of the title to the lands involved, such contract will be enforced even if the terms of the extension agreements were not fully complied with, especially when it appears that the doubt as to the character of the title was raised by the defendant's lawyer and agent, who afterwards acknowledged his mistake, and advised the defendant to accept the title offered.

----

On bill, &c.

*Messrs. Smith & Brady,* for the complainant.

*Mr. Osiris D. McConnell,* for the defendants.

BACKES, V. C.

This suit is to compel Thomas Buerk, one of the defendants, to specifically perform his contract to purchase of the complainant his farm, and to enjoin him from further prosecuting his suit at law for damages for an alleged breach of the contract.

The complainant is the owner of a small farm made up of six tracts, which the defendant agreed, in writing, to buy and pay therefor $2,100. On the day fixed for the transfer the lawyer, employed by the defendant to examine the records, reported that he had found a serious defect in the title of two of the tracts, and also an uncanceled mortgage, and advised his client not to perform unless the matters were cleared up, which, he said, could be done by proceedings in chancery. The complainant and defendant accepted his representations without question and, upon his suggestion, entered into a supplemental agreement, stipulating that the defendant was to be let into possession of the farm and the complainant was to quiet the title by bill, and to this end the complainant directed the lawyer to take the necessary steps. Further, and according to stipulation, the complainant executed to the defendant his warranty deed for the farm and delivered it to the Citizens National Bank of Bloomsbury, and the defendant deposited with the bank $1,545, the balance of the consideration price (the difference having been previously adjusted). The bank was to transfer the deed and money when notified by the lawyer that the title had been perfected in the manner agreed upon, and if it were not cleared up by the day fixed, the bank was to return the deed and the money to the respective parties, and the complainant was to forfeit to the defendant $250. The lawyer neglected to file the bill and a further agreement was made extending the time of performance to March 1st, 1918, with the modification that $500 instead of $250 was to be the forfeit. Before the time expired the lawyer discovered that he had erred in judging the title to be defective and that the uncanceled mortgage was a cloud upon it, and so informed his client, the defendant, stating that a suit in chancery was unnecessary and advised him to consummate the deal. The defendant, evidently because he felt he had made a poor bargain, refused. He stood flatly upon the terms of the supple-

mental agreements, and by his present solicitor brought an action in the supreme court against the complainant and the bank to recover the deposit of $1,545, the $500 forfeit and $1,500 for breach of the contract. Upon the filing of this bill the suit at law was stayed.

The things the lawyer found in his examination of the county records were these: Holoway Gano acquired the land in 1853. He died in September, 1855, and by his will gave his estate, real and personal, to his widow, Liveria, her heirs and assigns forever, "recommending (*sic*) to her if any of said property remained at her decease that the same shall descend to my children, Joseph J. Gano, George Gano, Martin Gano and Cornelia Francis Gano, share and share alike." There is no record of a deed by the widow devisee or her heirs and therein is the break in the title. Wesley Johnson, the executor of the will, presumed to convey the land to John Butler, by deed dated March 31st, 1856, in which it was recited that

"whereas the said Holoway W. Gano, deceased, did in and by his last will and testament order and direct 'that after all of my just debts and funeral expenses be paid, all of the remainder of my property, both real and personal, I give, devise and bequeath to my beloved wife, Liveria, to her, her heirs and assigns forever.' * * * Now this indenture witnesseth, that the said Wesley Johnson as aforesaid, in pursuance of the authority and power given him in and by said will, did advertise the real estate of said Holoway W. Gano, deceased, to be sold on Friday, the 9th day of November, 1855, and then and there did proceed to sell the said real estate, and the said John Butler did then and there bid for the same the sum of $800, and no one bidding more I did strike off and sell the same to the said John Butler, the highest bidder."

Butler went into possession and, in 1869, his administrator, under orphans court authority, conveyed to Christiana Butler, who, in June of 1869, conveyed to David W. Dilts. Dilts conveyed to Johnson Hummer, the father of the complainant, in 1876, and Johnson Hummer's heirs conveyed to the complainant on March 21st, 1884. The uncanceled mortgage of $150, payable in one year, was made by Holoway Gano to one Peter Hardy, March 30th, 1855.

The evidence is that the record title holders have been in peaceable possession of the tract from Gano to the complainant,

inclusive, for a period of more than sixty years. The complainant, now sixty-six years old, who lived on an adjoining farm, recalls that, as a boy of seven or eight, John Butler (who bought in 1856) occupied the place. In this, and in his statement that Butler and all subsequent title holders, in their turn, were in possession, he is not denied. As to the uncanceled mortgage he says, and it is not disputed, that he never heard of it in the thirty-four years of his ownership. It is suggested that sixty years of continuous possession by the title holders is not made out absolutely, in that the complainant's recollection of Butler's occupancy, at the most, goes back to but fifty-eight or nine years. Admitting this to be so, it must be assumed at this distant date that Butler at that time was in possession under his title, good or bad, and that he went into possession forthwith after he got his deed, more than sixty years ago. It is also established that when the lawyer advised the defendant not to perform the original contract he was wholly unaware of sections 28 and 29 (*Comp. Stat. p. 3172*) of our statutes of limitations, the former of which provides that

"sixty years' actual possession uninterruptedly continued by occupancy, descent, conveyance or otherwise in whatever way or manner such possession might have commenced or have been continued, shall vest a full and complete right and title in every actual possessor or occupier,"

and the latter of which provides that thirty years of such possession obtained by a fair *bona fide* purchase of any person in possession and supposed to have a legal right and title to the land, shall vest an absolute right and title in the actual possessor and occupier. The latter section contains a proviso that if any person having a right or title to the lands, be within the age of twenty-one, *feme covert, non compos,* imprisoned or without the United States of America at the time the title first descended or accrued, shall have his action, notwithstanding the limitation, provided it be brought within five years after the removal of the disability. Whether the lawyer knew of sections 16 and 17 of the same statutes, and their bearing upon the uncanceled mortgage of $150, was not disclosed, as I recall the evidence, but it is a fair assumption that he did not.

Now, it is obvious that the provision of section 28 operating upon the unbroken, adverse possession for more than sixty years, sets at complete rest the complainant's title. And aside from this the operation of section 29 upon the complainant's personal possession of more than thirty years certifies his absolute ownership. And, furthermore, there is an equitable side that works against the defendant and which should have appealed to him. Liveria Gano was not, of course, divested of her title by the conveyance of Holoway Gano's executor, but judging from the recitals in the deed that the lands were sold at public vendue, after advertisement, under supposed powers given by the will, there can be little doubt that she acquiesced in his efforts and enjoyed the fruits. That she, or her heirs, are presently within the protection of the five-year extension of the twenty-ninth section of the Limitation act, is incredible. In a somewhat similar situation where the adverse possession was for only forty years, Vice-Chancellor Emery held that the possibility was too remote to cast a doubt on the marketability of the title. *Day* v. *Kingsland, 57 N. J. Eq. 134.*

That the complainant has a clear and marketable title is not controverted, nor is it questioned that the fuss created by the lawyer was due to his ignorance of the law, nor that due to his mistaken advice, the supplement agreements were entered into by the parties under a mutual misapprehension of the true state of affairs. But the defendant takes the position that the contract as modified requires that the scars on the title, sores long since healed by the statutes, should be doctored and obliterated by a bill *quia timet,* and that because the remedy, though entirely useless and unavailing, was not applied, he is no longer bound. This attitude and insistence altogether loses sight of the established facts of the case that the title was unimpaired, that the main contract was enforceable, and that the modifications were the results of erroneous impressions of the law, mutually entertained by the parties and under the influence of which they acted. Equity relieves against the consequences of mutual mistakes of law, particularly where, as here, they are produced by the agent of the party seeking to take advantage of them. *Green* v. *Morris and Essex Railroad Co., 12 N. J. Eq. 165.* In *Freich-*

*necht* v. *Meyer, 39 N. J. Eq. 551,* the power of courts of equity to relieve from mistakes of law is upheld.

The only course open in order to do justice to both parties, or as nearly as the circumstances of the case will permit that to be done, is, as I see it, to enforce the contract and to perpetually enjoin the action at law. The guiding principle in the exercise of the jurisdiction is that declared in *Plummer* v. *Keppler, 26 N. J. Eq. 481,* and repeated in numerous cases. "The remedy by specific performance is discretionary; the question is not what must the court do, but what, in view of all the circumstances of the case in judgment, should it do to further justice. When the contract has been fairly procured, and its enforcement will work no injustice or hardship, it is enforced almost as a matter of course; but if it has been procured by any sort of fraud or falsehood, or its enforcement will be attended with great hardship or manifest injustice, the court will refuse its aid." The sales agreement was fairly entered into in all respects, and since the defendant was chiefly, if not wholly, responsible for the later happenings that led up to this litigation, it will do him no injustice to compel him to stand by his bargain, even though he be slightly out of pocket by the delay and his own shortcomings. The lawyer who threw the wrench into the machinery was his agent. He readily enough took his counsel which, in the first instance, carried him and the complainant far astray, and he ought to have been as willing to take his better judgment and advice, which would have led them safely out of the complication. He accepted the advantages of his agent's mistake and in reason, and rightly, should have foregone them when his agent acknowledged the mistake. The lawyer was the defendant's adviser and the relation was not terminated by the complainant engaging him to file the bill in equity. His employment by the complainant was only in a limited capacity, in entire subordination to the agency, and merely to overcome obstacles fancied by him as the agent of the defendant.

To refuse a specific performance of the contract would, on the other hand, work hardship to the complainant. As already told, the defendant went into possession of and still occupies the farm. He has failed to till it according to the usual manner of

husbandry, and it has admittedly suffered in consequence, so that the complainant cannot be fully restored. Furthermore, a refusal of relief would abandon the complainant to the law courts, where, according to the strict rules of their jurisprudence, his equities are inadmissible, and where he might be, in resisting the defendant's effort to collect the forfeiture and damages, at the mercy of whimsical and capricious jurors—a hazard to which he ought not be exposed.

A decree will be advised accordingly, with costs.